**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J, and BOGGS, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

June 15, 2016

# In the Court of Appeals of Georgia

A15A2232. BASKIN v. HALE.                                        DO-109

A16A0654. BASKIN v. HALE.                                        DO-024

DOYLE, Chief Judge.

Shannon Baskin and Gary Hale, who never married, have two biological sons. Baskin also has a daughter from a preceding relationship. In Case No. A15A2232, Baskin appeals the superior court's final judgment awarding Hale primary physical custody of all three children. In Case No. A16A0654, Baskin appeals the superior court's order granting a permanent injunction prohibiting the parties, their attorneys, and court personnel from discussing the custody case with the media and/or from placing or causing the placement of any information about the case on social media. For the reasons that follow, in Case No. A15A2232, we affirm in part and reverse in part. In Case No. A16A0654, we vacate the injunction.

In 2003, the parties began a romantic relationship; Baskin's daughter, A. W., was ten months old, and the parties shared parenting duties.[1] In July 2005, the parties' first son, G. H., was born, and they moved in together. The parties ended their relationship in 2006, and in 2007, Hale sought to legitimate their son. On March 30, 2007, the parties entered into a consent order, which legitimated their son, provided the parties with joint legal custody of both children, gave Baskin primary physical custody of her daughter and Hale primary physical custody of their son, and gave Hale visitation with both children four nights a week and Baskin visitation the other three nights. The consent order specifically acknowledged that Hale was not A. W.'s biological father, but stated that Hale "raised [her] as his own" while he lived with Baskin and that A. W. had lived with one or the other of the parties since their separation. The order was signed by both parties and the superior court.

On March 14, 2014, Baskin filed a petition for modification of custody, seeking to terminate Hale's joint custodial rights and visitation rights as to her daughter and modify his visitation rights as to their oldest son.[2] Hale filed an answer

[1] In the final judgment, the superior court noted that A. W.'s biological father had not legitimated her, supported her, or had any parental contact with her.

[2] The modification petition did not mention the parties' second son, W. H., who was born in 2008.

and a counterclaim for contempt, legitimation of their second son, W. H., and a custodial determination as to W. H.[3] On May 12, 2014, the superior court appointed a Guardian Ad Litem ("GAL"). On July 30, 2014, following a status hearing, at which the GAL testified, the court entered a temporary order: granting the parties joint legal custody of their second son, with Hale having primary physical custody; maintaining the parties' joint legal custody of A. W. and G. H., granting Baskin primary physical custody of her daughter and Hale primary physical custody of their oldest son; and giving the parties equal visitation with the children (every other week, from Wednesday to Wednesday).

On April 27, 2015, following a final hearing, the superior court entered a final custody judgment, awarding the parties joint legal custody of all three children, with Hale having primary physical custody, and granting Baskin visitation with them every other weekend, one afternoon each week, on alternating holidays, and every other week during the summer. The court concluded in the order, that, among other things, Baskin "interfered with Hale's rights to [G. H.] and [A. W.]"; Baskin "engaged in a pattern of parental alienation" and "defied orders of [the] court"; "Baskin's household

_____

[3] Hale alleged in the petition that Baskin refused to comply with their consent agreement and that he had not had visitation with A. W. since November 2012.

3

is chaotic and unstable[, and s]he cannot control [A. W.]"; law enforcement had been called to the Baskin residence at least six times during the pendency of the litigation; "[t]he children are unsafe in Baskin's primary care"; "Baskin is controlling, manipulative, recalcitrant[,] vindictive[, and not . . . truthful"; and "Hale appears to maintain a stable household [and to be] capable of providing . . . [the] structure and stability" that "A. W. desperately needs." Applying the factors set forth in OCGA § 19-9-3 (a) (3), the court concluded that "the preponderance of the evidence demonstrates that it is in the children's best interest for Hale to have primary physical custody."[4] Further, while acknowledging that Hale was not the biological or legal father of A. W., the superior court found that Hale "acquired parental status through the 2007 [c]onsent [o]rder,"[5] "Baskin is unfit for physical custody of [A. W.],"[6] and "by clear and convincing evidence, . . . if [A. W.] remains in the primary physical

---

[4] (Emphasis omitted.)

[5] The superior court noted in its order that the parties included A. W. in the 2007 consent order at Baskin's suggestion.

[6] (Emphasis omitted.)

4

custody of Baskin, [A. W.] will suffer physical harm and significant long-term emotional harm."[7]

On April 28, 2015, the superior court entered an order granting an injunction until their youngest son reaches 18 years of age.[8] The court noted therein that it had previously entered a "gag order" in the case after Baskin made "derogatory and disparaging comments" on social media about Hale, the court, and the proceedings, which comments the court concluded were "detrimental to the parties' minor children [] and intimidating to the parties." The court also concluded that, in an effort to intimidate the court and "invite the attention of the media to this case," Baskin had filed a motion to recuse,[9] as well as a complaint in federal court to enjoin enforcement of the gag order. Thus, the court ordered, in relevant part, that:

> [Baskin, Hale], their attorneys, and the [GAL] are hereby restrained and enjoined from putting, placing[,] or causing to be placed any information concerning this custody case upon or in any social media, website, or other public medium. The parties are restrained and enjoined from, directly or indirectly, putting, placing, or causing to be placed any

---

[7] (Punctuation omitted.)

[8] The order also included a child support award, including arrearage. Baskin does not challenge that portion of the order on appeal.

[9] The court denied the motion to recuse.

5

disparaging or derogatory comments about the opposite party upon or in any social media, website, or other public medium. The restrictions of this paragraph include restricting the persons named or referred to from speaking or corresponding with any print, radio[,] or television media about this case. This restriction shall extend until [W. H.] attains the age of 18 years. [The parties] and their attorneys are hereby restrained and enjoined from putting, placing[,] or causing to be placed any allegation that any transcript in this case has been altered upon or in any social media, website, or other public medium, or speaking or corresponding with any print, radio[,] or television media about any such allegation. This issue was adequately addressed in this court's Final Order Denying Production of Audio Recordings, entered April 23, 2015. Any allegation that this court's reporter's transcript of the July 11, 2014 [hearing] is flawed is frivolous, and without any foundation in law or in fact. This matter is res judicata with respect to the parties.

These appeals followed.

*Case No. A15A2232*

Baskin appeals the final judgment awarding primary physical custody of all three children to Hale.[10]

---

[10] This appeal was originally docketed on July 24, 2015. On September 9, 2015, it was dismissed based upon Baskin's failure to file a brief. On October 1, 2015, this Court granted Baskin's motion for reconsideration and reinstated her appeal.

1. *Custody of A. W.* Baskin contends that the trial court erred by granting custody of her daughter, A. W., to Hale. We agree.

"Only the mother of a child born out of wedlock is entitled to custody of the child, unless the father legitimates the child as provided in Code Section 19-7-21.1 or 19-7-22. Otherwise, the mother may exercise all parental power over the child."[11] Here, A. W.'s biological father has made no efforts to legitimate A. W., and Hale has made no efforts to terminate the biological father's parental rights or to adopt A. W. Nonetheless, Hale argues that Baskin relinquished to him her parental power over A. W. by giving him joint custody with reasonable visitation rights to her daughter in the 2007 consent order. This argument is without merit.

Parental power over a child may be lost pursuant to OCGA § 19-7-1 (b) (1) by "[v]oluntary contract releasing the right to a third person. . . ."[12] As the trial court

---

[11] OCGA § 19-7-25. See also *Veal v. Veal*, 281 Ga. 128, 128-129 (636 SE2d 527) (2006).

[12] Hale also argues that OCGA § 19-7-1 (b.1) contemplates the loss of custody by a parent to a third party upon a determination by a trial court that "an award of custody to such third party is for the best interest of the child . . . and will best promote [her] welfare and happiness." But "third party" is specifically "limited to [a] grandparent, great-grandparent, aunt, uncle, great aunt, great uncle, sibling, or adoptive parent." OCGA § 19-7-1 (b.1). Because Hale is neither the adoptive parent of A. W. nor one of the relatives listed in the Code section, OCGA § 19-7-1 (b.1) provides him no basis for obtaining custody of A. W. See *Phillips v. Phillips*, 316 Ga.

7

acknowledged, all of the cases citing that Code section contemplate a parent's complete relinquishment of their entire parental rights.[13] But the trial court interpreted the statute to authorize a permanent surrender of a partial portion of parental power. Pretermitting, however, whether OCGA § 19-7-1 (b) (1) allows a permanent partial surrender of parental power, Baskin did not permanently surrender her parental power or custody rights to A. W. in the 2007 consent order.

To support a finding that a party relinquished her parental rights pursuant a voluntary contract under OCGA § 19-7-1 (b) (1), "the evidence must establish clear, definite, and unambiguous terms of a such a contract."[14] Here, there is no indication that when entering the 2007 consent order, the superior court decided that Hale would have a permanent ongoing custodial right in A. W. or that such a custodial arrangement was in the child's best interest. By entering into the consent order, Baskin simply agreed that Hale was entitled to joint custody of A. W., with liberal

App. 829, 831-832 (2) (730 SE2d 548) (2012).

[13] See, e.g., *Stills v. Johnson*, 272 Ga. 645, 646 (533 SE2d 695) (2000); *In the Interest of M. A. F.*, 254 Ga. 748, 750 (1) (334 SE2d 668) (1985).

[14] *Blackburn v. Blackburn*, 168 Ga. App. 66, 70-71 (1) (308 SE2d 193) (1983), citing *Shaddrix v. Womack*, 231 Ga. 628, 631 (3) (203 SE2d 225) (1974); *Waldrup v. Crane*, 203 Ga. 388, 390 (46 SE2d 919) (1948); *Beavers v. Williams*, 199 Ga. 113, 124 (2) (33 SE2d 343) (1945).

visitation, *at that time*. She did not bestow upon Hale *permanent* custodial or parental rights in A. W.[15] Thus, the record does not support the trial court's conclusion that Baskin voluntarily relinquished her parental power pursuant to OCGA § 19-7-1 (b) (1).

In a similar argument, Hale contends that the 2007 consent order is res judicata[16] as to the issue of custody, contending that because she consented to that

---

[15] See *In the Interest of M. F.*, 298 Ga. 138, 143, n. 11 (780 SE2d 291) (2015) ("[E]ven if the father had consented to the entry of [an order granting permanent guardianship to a third party], it would mean only that he could not be heard to complain that the juvenile court erred by setting up a permanent guardianship in the first place. The father does not complain now, however, that a permanent guardianship was not warranted [at the time the guardianship was established]. To the contrary, he says that things have changed since then, and the permanent guardianship ought to now be set aside.").

[16] The doctrine of res judicata seeks to bring finality to litigation. By law, a judgment of a court of competent jurisdiction shall be conclusive between the same parties and their privies as to all matters put in issue or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered until the judgment is reversed or set aside. *Austin v. Cohen*, 268 Ga. App. 650, 654 (1) (602 SE2d 146) (2004) (punctuation omitted), quoting OCGA § 19-12-40. The Supreme Court of Georgia "has held, however, that the doctrine of res judicata – and in particular, the rule that bars re-litigation of matters that could have been, but were not actually, raised and decided in a previous action – should not be applied mechanically in divorce and alimony cases. The true rule of res judicata in divorce and alimony cases . . . is that a final decree has the effect of binding the parties and their successors as to all matters which were actually put in issue and decided, or which by necessary implication were decided between the parties. Or as the Court of Appeals later put the point, the doctrine of res judicata is less strictly applied in

custody arrangement, Baskin is now barred from arguing that Hale has no legal right to custody of A. W. But this argument ignores the fact that, unlike adoption or termination of parental rights, custody and visitation rights are subject to review and modification.[17] Given the absence of consent by Baskin or a prior finding by the court that Hale had a permanent custodial right in A. W., the doctrine of res judicata does not control this case.[18]

---

divorce and alimony cases . . . and does not bar litigation of matters that merely could have been put at issue in the earlier proceeding. *Hardman v. Hardman*, 295 Ga. 732, 735 (2) (763 SE2d 861) (2014) (citations and punctuation omitted), quoting *Brookins v. Brookins*, 257 Ga. 205, 205-206 (357 SE2d 77) (1987) and *Dial v. Adkins*, 265 Ga. App. 650, 651 (595 SE2d 332) (2004). Although this case does not involve divorce, we find the application limitation on res judicata equally applicable to custody cases.

[17] See OCGA § 19-9-3 (b).

[18] Compare *Bates v. Bates*, 317 Ga. App. 339, 342-344 (730 SE2d 482) (2012) (res judicata barred biological mother's challenge to the validity of a consent adoption decree because she had a full and fair opportunity to litigate this issue in a prior motion to set aside the adoption). We acknowledge the holding in *Rimmer v. Tinch*, 324 Ga. App. 65 (749 SE2d 236) (2013), in which this Court held that the doctrine of res judicata barred the mother and adoptive father's challenge to the legality of a prior consent order terminating the biological father's rights, granting adoption by the stepfather, granting visitation to the paternal grandmother, granting supervised visitation by the biological father, and agreeing that the biological father could petition the court for unsupervised visitation after one year. However, because one judge joined in the judgment only, *Rimmer* is physical precedent only. See *Avila v. State*, 333 Ga. App. 66, 70, n. 9 (775 SE2d 552) (2015); Court of Appeals Rule 33 (a). Moreover, *Rimmer* is easily distinguishable. In that case, the mother and stepfather specifically agreed to allow the biological father to seek unsupervised

10

Accordingly, because Hale had no right to permanent custody of A. W., "we reverse the juvenile court order and direct [the court] on remand to award custody [of A. W.] to [Baskin]."[19] In so doing, we "simply find that [Hale] had no standing to seek custody [of A. W.] in this case."[20]

2. *Custody of G. H. and W. H.* Baskin also argues that the superior court abused its discretion by awarding primary physical custody of the parties' two sons to Hale. Baskin, however,

> stated in her amended notice of appeal that no transcript would be filed for inclusion in the appellate record, and no statutorily authorized substitute for the transcript has been submitted. Because the transcript

---

visitation after a year in exchange for his agreement to terminate his parental rights and consent to the adoption by the stepfather. And the mother and adoptive father sought to invalidate only that portion of the agreement granting the biological father's visitation rights, leaving the adoption and termination of his parental rights intact. Here, by contrast, Hale did not relinquish any rights in exchange for joint custody of A. W., and Baskin did not agree to any future custodial arrangement for Hale. Therefore, this case does not present the same quid pro quo final adjudication of custody.

[19] *In the Interest of C. L.*, 284 Ga. App. 674 (644 SE2d 530) (2007).

[20] Id. at 676 (1).

of the evidentiary hearing is not part of the record, we must presume that the trial court's ruling was correct and affirm.[21]

Accordingly, this enumeration presents no basis for reversal, and we affirm the final judgment on custody with regard to G. H. and W. H.

*Case No. A16A0654*

3. *Injunction*. Baskin argues that the superior court erred by entering the injunction.[22] We agree.

In the order granting the injunction, the court noted that it was proceeding under OCGA § 9-11-65 (e), which empowers courts in "actions for divorce, alimony, separate maintenance, or custody of children . . . [to] make prohibitive or mandatory orders, with or without notice or bond, and upon such terms and conditions as the court may deem just." The court cited *Lacy v. Lacy*,[23] in which this Court affirmed a

---

[21] *Trotter v. Ayres*, 315 Ga. App. 7, 10 (3) (726 SE2d 424) (2012). See also *Hadden v. Hadden*, 283 Ga. 424 (1) (659 SE2d 353) (2008).

[22] Baskin filed a notice of appeal in this case in the Supreme Court of Georgia. On October 2, 2015, the Supreme Court dismissed the appeal on the basis that a discretionary application was required because the case was a "domestic relations" case under OCGA § 5-6-35 (a) (2). On November 2, 2015, on reconsideration, the Supreme Court vacated the dismissal order and transferred the appeal to this Court.

[23] 320 Ga. App. 739 (740 SE2d 695) (2013).

12

trial court's *temporary* restraining order enjoining the parties in an ongoing divorce and child custody proceeding from "posting matters about each other or their current litigation on Facebook or other social networking sites."[24] This Court noted that "a trial court can require the parties in a divorce proceeding to refrain from making derogatory remarks about the other before the children."[25]

Our analysis, however, does not end there. Prior restraints of speech,[26] such as the order here, are not unconstitutional per se, but they bear a "heavy presumption against [their] constitutional validity. The Government thus carries a heavy burden of showing justification for the imposition of such a restraint."[27] An attempt to effect a prior restraint is subject to "exacting scrutiny."[28] The United States Supreme Court has instructed that:

---

[24] Id. at 752 (12).

[25] (Punctuation omitted.) Id., quoting *Maloof v. Maloof*, 231 Ga. 811, 812 (6) (204 SE2d 162) (1974).

[26] "Gag orders . . . exhibit the characteristics of prior restraints." *United States v. Brown*, 218 F3d 415, 424 (II) (5th Cir. 2000).

[27] (Citations and punctuation omitted.) *New York Times Co. v. U. S.*, 403 U. S. 713, 714 (91 SCt 2140, 29 LE2d 822) (1971) (per curiam). See also *Paramount Pictures Corp. v. Busbee*, 250 Ga. 252, 255, n. 5 (297 SE2d 250) (1982).

[28] *Smith v. Daily Mail Publishing Co.*, 443 U. S. 97, 102 (3) (99 SCt 2667, 61 LEd 2d 399) (1979).

[p]roperly applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression. The possibility that other measures will serve the State's interests should also be weighed.[29]

Reviewing the injunction in this case, we conclude that the superior court failed to properly balance the danger flowing from the prohibited speech with the parties' and attorneys' First Amendment rights. The superior court did reference its finding in the temporary restraining order that it balanced Baskin's First Amendment rights with "the rights of the children not to have derogatory and disparaging comments posted in a public forum concerning their parents and the rights of the children [not to] have details concerning their family's legal issues placed in a public forum," finding that "placing derogatory and disparaging remarks in the public forum . . . concerning the opposite party and/or placing details concerning this litigation in the public forum is detrimental to the parties' minor children . . . and intimidating to the parties." The court, however, failed to share the basis of such a conclusion, pointing

---

[29] *Landmark Communications v. Va.*, 435 U. S. 829, 842-843 (IV) (98 SCt 1535, 56 LE2d 1) (1978).

to no evidence regarding the negative affect that such speech had on the children, and it made no attempt to find that the injunction was narrowly tailored to protect any compelling interest.

We further note that although Hale filed a motion for the temporary restraining order subsequently issued by the court, he did not move for a permanent restraining order.[30] Instead, the trial court issued the permanent injunction sua sponte, referencing a motion to recuse filed by Baskin, as well as an action she filed in federal court seeking to overturn the temporary order, noting that her actions "[were] an obvious attempt to intimidate the [judge]."

Our review of the order, the record, and the transcript of a status conference indicates that the trial court was primarily concerned with Baskin's public criticism regarding the litigation, including the court's rulings, as well as the involvement of third parties who, among other actions, questioned the accuracy of court transcripts.[31]

---

[30] Hale has not filed a brief in this case.

[31] For example, at a status conference, the superior court told Baskin: "I am also concerned – this does not – it really doesn't affect you very much, but I am also concerned – I'm more than concerned. I'm hacked off, if you want to know the truth, about people meddling in my cases. And that's what I've got going on here. . . . These [third parties] people who have injected themselves and are undermining the judicial process. And when you take them and then you add it to the comments [you made on a website seeking funding for your attorney fees in which you state you have been

As the United States Supreme Court has stated,

> [w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. Although it is assumed that judges will ignore the public clamor or media reports and editorials in reaching their decisions and by tradition will not respond to public commentary, the law gives judges as persons, or courts as institutions no greater immunity from criticism than other persons or institutions. The operations of the courts and the judicial conduct of judges are matters of utmost public concern.[32]

Certainly, we recognize the authority granted to trial courts to restrict a parent's communications and postings on social media during the pendency of a divorce or custody proceeding, as the trial court did in *Lacy*.[33] But we cannot condone the superior court's attempt in this case to restrict the parties' and lawyers' right to

---

railroaded], it looks like one could believe that there is something that is corrupt about the system. I take offense to that. . . . And we're going to have a judge's meeting tomorrow. We're going to get to the bottom of this issue, of people undermining the judicial system."

[32] (Citations and punctuation omitted). Id. at 838-839 (III) (A), quoting *Mills v. Alabama*, 384 U. S. 214, 218 (86 SCt 1434, 16 LE2d 484) (1966), and *Bridges v. Ca.*, 314 U. S. 252, 289 (62 SCt 190, 86 LEd 192) (1941) (Frankfurter, J., dissenting).

[33] *Lacy*, 320 Ga. App. at 752 (12).

publically criticize the court and the litigation for the next ten years. Given the absence of any evidence of "imminent danger to a compelling interest of such magnitude that the restraint on the parties' [and lawyers'] speech would be warranted," as well as the superior court's failure to properly conduct the balancing test and narrowly tailor the restrictions, we vacate the permanent injunction issued in this case.[34]

*Judgment affirmed in part and reversed in part in Case No. A15A2232.*

*Judgment vacated in Case No. A16A0654. Phipps, P. J., and Boggs, J., concur.*

---

[34] *In the Interest of R. J. M.*, 133 So3d 335, 346 (II) (Miss. 2013). See also *In re Interest of T. T.*, 18 Neb. App. 176, 198 (779 NW2d 602) (Neb. 2009) ("In the end, we must conclude that the evidence is simply insufficient, absent conjecture and speculation which we cannot engage in, to satisfy the State's heavy burden to justify this prior restraint on free speech and to overcome the heavy presumption of unconstitutionality of a prior restraint on speech. There is no evidence proving imminent harm to [the child in the custody case] of a magnitude that justifies a prior restraint on free speech. Therefore, we vacate that portion of the juvenile court's order . . . preventing the parents from disclosing information about [the child].").